# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:20-cr-22 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| DENNIS McKENZIE, | ) | |
| | ) | |
| DEFENDANT. | ) | |

On January 8, 2020, an indictment issued charging defendant Dennis McKenzie ("defendant" or "McKenzie") with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. No. 1 ["Ind."].) Now before the Court is McKenzie's motion to suppress evidence seized by the government in connection with this charge. (Doc. No. 13 ["Mot."].) Specifically, McKenzie seeks to suppress evidence seized during an October 17, 2019 traffic stop in Cleveland, Ohio. Plaintiff United States of America (the "government") opposes the motion (Doc. No. 14 ["Opp'n"]) and filed a supplement to its opposition. (Doc. No. 19 ["Suppl. Opp'n"].) The Court conducted an evidentiary hearing on the motion on January 26, 2021; at the conclusion of the hearing, the Court took the matter under advisement.

For the reasons that follow, the motion to suppress is DENIED.

## I. BACKGROUND

*Sergeant Al Johnson*

Three witnesses testified at the evidentiary hearing. Sergeant Al Johnson, a nineteen (19)

year veteran of the Cleveland Police Department, is a member of the Police Gang Impact Unit ("Gang Unit").[1] The role of the Gang Unit is to investigate gang activity and attempt to disrupt gang-related violence in Cleveland. The unit, Sergeant Johnson explained, is tasked with "getting guns off the street." There was also testimony that the Gang Unit often coordinated efforts and worked as a team.

Sergeant Johnson testified that on October 17, 2019, he and other members of his unit were in the area of Yeakel Avenue—Cleveland's Fourth District known for high gang activity—"doing our gun suppression and gang investigations." He and his fellow officers were driving unmarked cruisers and were wearing plain clothes and blue bullet-proof vests with bold white lettering denoting "POLICE" across the front. At approximately 10:50 p.m., Sergeant Johnson observed a vehicle illegally parked on the street. Specifically, the small SUV was parked too far away from the curb in violation of Cleveland Municipal Ordinance 451.04(a). At the hearing, Sergeant Johnson identified photographs depicting the vehicle in relation to the curb. (Government Exhibits ["Gov. Exs."] 1, 3, 5.) From the photographs, it is clear that the vehicle was parked well beyond the 12 inch distance permitted by the ordinance.[2]

---

[1] At the hearing, the Court announced that it would grant the government's motion *in limine* to preclude the introduction of a ruling by another judicial officer in a separate matter addressing the plausibility of the testimony of Sergeant Johnson. (*See* Doc. No. 18.) The Court ruled that Fed. R. Evid. 608(b) prohibited attacking or supporting a witness' character for truthfulness with such extrinsic evidence. The Court further ruled, however, that defense counsel was free to impeach Sergeant Johnson with any inconsistent statements from this prior proceeding. Defense counsel did not identify or attempt to impeach Sergeant Johnson with any prior inconsistent statements.

[2] In fact, in one of the photographs, Sergeant Johnson is shown standing in the gap between the vehicle and the curb with room to spare. (*See* Gov. Ex. 3.)

He testified that he and the other officers parked their cruisers near the SUV and started walking toward the vehicle for the purpose of investigating the parking violation. As he approached the passenger side of the vehicle, he observed the passenger (McKenzie) open the door and extend the upper half of his body out of the vehicle. He instructed McKenzie to get back into his vehicle, and McKenzie initially complied with the order. Once back in the vehicle, Sergeant Johnson observed McKenzie moving about the vehicle's interior, "flailing his arms," screaming and yelling, looking back and forth, and appearing very nervous.

McKenzie then exited the vehicle. At that point Sergeant Johnson decided to detain him. While Sergeant Johnson and others (Detective Cribel and Detective Harrigan) were attempting to gain control over McKenzie, Detective Skernivitz (now deceased), was speaking with the individual in the driver's seat of the SUV. She appeared to be an underaged female, approximately 17 years old, who was wearing jeans and a bra but no shirt or coat. Meanwhile, Sergeant Johnson positioned his body between McKenzie and the vehicle, looked inside the vehicle, and observed the handle of a gun in the lunge area under the passenger seat. The weapon was recovered from the vehicle and McKenzie was arrested on gun charges, while Detective Skernivitz issued a citation to the driver for the parking violation.

*Detective Robert Kowza*

Detective Robert Kowza, another member of the Gang Unit, also testified that the officers approached the SUV to investigate the parking violation. He explained that he was one of the officers who approached the driver's side of the parked vehicle. He agreed that the individual in the driver's seat was a young female approximately 15–16 years old. By the time he arrived on the scene, Detective Skernivitz was already speaking with the female. Detective

3

Kowza testified that he was concerned by the young woman's minimal attire because it was October and the weather was chilly. After the female was asked to exit her vehicle, Detective Kowza retrieved her coat from the SUV.

Once out of her vehicle, the female spoke with Detective Kowza and other officers who attempted to obtain information regarding where she lived and why she was wearing so little clothing. The young woman did not have much to say and ultimately advised the officers that "nothing in [the SUV] is mine." After he concluded his conversation with the female driver, and after Sergeant observed the weapon under the passenger's seat, Detective Kowza recovered and secured the weapon.

*Detective Michael Harrigan*

A third member of the Gang Unit—Detective Michael Harrigan—also testified. He indicated that he and his partner, Detective Cribel, responded to a radio report from fellow team member Sergeant Johnson of an illegally parked car on Yearkel Avenue. He and his partner approached the passenger side of the door and saw the passenger door open before McKenzie was instructed to close the door and remain in the vehicle. As he got closer to the vehicle, Detective Harrigan also saw the young female driver. He described her clothes as "disheveled," and he confirmed she was wearing jeans and a bra with no shirt or jacket.

But his primary focus was McKenzie. Like Sergeant Johnson, Detective Harrigan testified that McKenzie was moving around in the vehicle and looking back and forth. Detective Harrigan further noticed that McKenzie would not make eye contact with the officers. McKenzie subsequently got out of the car and walked several feet away from the vehicle. According to McKenzie, he started to "kind of push off of the car" and push away from the officers in what the

4

witness described as an attempt to get away. Detective Harrigan and other officers were eventually able to take control of McKenzie, place him in handcuffs, and walk him over to Detective Harrigan's cruiser. Detective Harrigan reported that, even after they placed him in the cruiser, McKenzie continued to struggle, attempting to get the handcuffs off his wrists.

Detective Harrigan testified that, prior to October 17, 2019, he was familiar with McKenzie through his social media posts and his past arrest record. In fact, he was aware that McKenzie had previously been seen on Yearkel Avenue, and that he had once lived with his mother in the house next door to where the SUV was illegally parked. Moreover, all three witnesses testified that their purpose that evening was to investigate gang activity. They further testified consistently that approximately eight (8) officers arrived on the scene in four (4) squad cars to investigate the parking violation.

## II. LAW AND DISCUSSION

### A. Standing

As an initial matter, the government questions McKenzie's standing to challenge the search of the vehicle. The exclusionary rule allows a defendant to suppress the evidentiary fruits of a violation of his Fourth Amendment Rights. 6 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.1, at 4 (4th ed. 2004). Because Fourth Amendment rights are personal rights, they may be enforced only by the person whose rights were infringed. Accordingly, a defendant cannot demonstrate standing to challenge a police search unless he can show he had a legitimate expectation of privacy in the place to be searched. *Rakas v. Illinois*, 439 U.S. 128, 138–48, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). The burden of proving a reasonable expectation of privacy is on the proponent of the motion to suppress. *Id.* at 130–31 n.1; *United States v.*

*Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988).

In *Rakas*, the Supreme Court held that the Fourth Amendment rights of passengers were not violated when the police unlawfully searched the vehicle in which they were riding if they had no ownership interest or reasonable expectation of privacy in the vehicle or its contents. *Rakas*, 439 U.S. at 148–49. Because the passengers (like McKenzie) did not own the vehicle or claim an ownership interest in its contents, the Supreme Court ruled that the only Fourth Amendment rights that had been violated were those of the vehicle's owner. *See id*.

But McKenzie points to the more recent Supreme Court decision in *Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007), to support the assertion that, as a passenger, he still has standing to challenge *the search* of the SUV. *Brendlin* holds that passengers in a motor vehicle subjected to a traffic stop are deemed seized for Fourth Amendment purposes (along with the vehicle and its driver), and thus are entitled to challenge the constitutionality of *the stop*, *see generally Brendlin, supra,* and the facts and the holding in *Brendlin* were limited to a passenger's standing to challenge the traffic *stop,* not the *search* of the vehicle. *Id*. at 252–53 (noting that the drugs and related paraphernalia were found on the defendant's person, and observing that the defendant "did not assert that his Fourth Amendment rights were violated by the search of [the] vehicle"). In particular, the Supreme Court did not find that the police stop and "seizure" of the vehicle conferred upon the vehicle's passengers an expectation of privacy where one did not previously exist.

The vast majority of courts to consider the question, including the Sixth Circuit, have concluded that *Brendlin* only confers upon a passenger standing to challenge the stop and not any subsequent search of the vehicle. *See United States v. Guzman*, 454 F. App'x 531, 534 (8th

6

Cir. 2012) (because the passenger is attempting to challenge the search of the vehicle, not the traffic stop, *Brendlin* provides him no support); *United States v. Trejo*, No. 3:14-cr-30138, 2015 WL 4392845, at *3 & n.10 (D. S.D. May 4, 2015) (finding *Brendlin* "did not modify earlier Supreme Court precedent relating to a passenger's standing to contest the search of another's vehicle" and collecting cases); *United States v. Valle-Irizarry*, No. 14-00103, 2014 WL 3673139, at *4 (D. N.J. July 22, 2014) ("Since the Defendant in this case is not challenging the legality of the traffic stop itself, but rather the subsequent search, the Court's holding in *Brendlin* is not applicable to the present facts."); *United States v. Villaverde-Leyva*, No. 1:10-cr-035, 2010 WL 5579825, at *15 (N.D. Ga. Dec. 9, 2010) (collecting cases, including *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007),[3] and noting that "the majority of courts that have considered the issue has concluded that *Brendlin* does not modify *Rakas* …, as it related to a passenger's standing to contest the search of another's vehicle"); *see also Agnosti v. Felton*, 521 U.S. 203, 235, 237, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997) (noting that when the Supreme Court overrules its own precedent it does so explicitly, and cautioning lower courts against finding that its "more recent cases have, by implication, overruled an earlier precent"). Accordingly, McKenzie's standing is limited to the initial police stop, and because it is undisputed that the weapon was found in the vehicle, and not on his person, McKenzie cannot challenge its discovery if the stop was valid.

---

[3] In *Ellis*, the Sixth Circuit affirmed the district court's conclusion that defendant, a passenger in a vehicle stopped by police, lacked standing to challenge the search of the vehicle and could only challenge the stop and the admission of any evidence found as a result of the detention. *Id*. at 612 ("Although a passenger does not have a legitimate expectation of privacy in the searched vehicle, 'as a passenger [a defendant] may still challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity.'") (quoting *United States v. Jones*, 374 F. Supp. 2d 143, 154 (D.D.C. 2005) (further quotation marks and citation omitted)).

B. **The Initial Investigatory Stop**

It is well settled that an officer has probable cause under the Fourth Amendment to stop a vehicle when he observes a driver violate a moving traffic law. *See United States v. Hughes*, 606 F.3d 311, 315–17 (6th Cir. 2010); *United States v. Graham*, 483 F.3d 431, 437 (6th Cir. 2007) (quotation marks and citations omitted). Likewise, probable cause exists for an investigatory stop when an officer has probable cause to believe that a driver has committed a parking violation. *See United States v. Copeland*, 321 F.3d 582, 593 (6th Cir. 2003); *United States v. Burton*, 334 F.3d 514, 517 (6th Cir. 2003) (Because the officer "observed the automobile driven by Burton stopped near a no-parking sign while not actually engaged in loading or unloading, Officer Davidson had probable cause to believe that Burton was violating local and state traffic laws.").[4]

The police officers testified consistently and convincingly that the SUV in question was parked on a city street in violation of a Cleveland municipal ordinance. The photographs of the parked vehicle, offered into evidence at the hearing, confirmed that it was parked in violation of municipal law. And a ticket was issued for this violation. *See Graham*, 483 F.3d at 438 ("The fact that a citation was issued only bolsters [the officer's] contention that he believed Graham was violating the law by parking in a no-parking zone.") While defendant complains that the officers were really on patrol that day looking for gang activity—and not parking violators—the officers' motivation is irrelevant; "[s]o long as the officer has probable cause to be believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not

---

[4] At the hearing, government's counsel suggested that the Fourth Amendment was not even implicated by the officers' actions because the approach of a parked vehicle does not constitute a traffic stop. However, "[c]ourts regularly analyze parked vehicle stops and their passengers' seizures as traffic stops for the purposes of the Fourth Amendment." *United States v. Stewart*, No. 1:18-cr-393, 2018 WL 4573267, at *2 & n.26 (N.D. Ohio Sept. 25, 2018) (citing, among authority, *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008)).

8

violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993); *see Burton*, 334 F.3d at 516 ("The Fourth Amendment … permits an officer who has probable cause to believe that a traffic violation is occurring to detain the automobile, regardless of the officer's subjective motivation for the stop.") (citing *Whren v. United States*, 517 U.S. 806, 812–13, 116 S. Ct. 1796, 135 L. Ed. 2d 89 (1996)); *United States v. Everett*, 601 F.3d 484, 495 n.12 (6th Cir. 2010) (an officer's "subjective intent or hope to uncover unrelated criminal conduct is irrelevant").

At the hearing, defense counsel's main point of contention was that the parking violation was a mere ruse to uncover evidence of weapons and gang activity. He underscored the fact that no fewer than eight officers in four squad cars responded to the scene, and that each witness who testified at the hearing confirmed that the Gang Unit's mission that day was to investigate gang activity. According to defense counsel, this excessive "over-policing" made it clear that what really was going on was a coordinated effort to generate opportunities to search vehicles—in areas known for gang activity—for illegal weapons.

Recently, the Sixth Circuit rejected a similar argument, noting that it was based on a "misunderstand[ing of] black-letter law." *United States v. Brooks*, No. 19-2283, 2021 WL 451010, at *3 (6th Cir. Feb. 9, 2021) (recommended for publication). In *Brooks*, officers pulled over a vehicle, having noticed that the individual sitting in the front passenger seat was not wearing her seatbelt. *Id*. at *1. The court explained that "'*Whren* puts an end to inquires' like [defendant's] 'about an officer's state of mind in conducting a traffic stop.'" *Id*. at *3 (quoting *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010)); *see also United States v. Zuniga*, 613 F. App'x 501, 506 (6th Cir. 2015) (an officer's intent is "immaterial" even if the officer had a

9

"pretextual motivation for the stop"). The court also gave short shrift to defendant's suggestion that the excessive number of officers allotted to respond to a suspected traffic infraction called the legality of the stop into question. *Brooks, supra* at *4. Specifically, the defendant argued that the fact that three officers approached the Jeep for a mere seatbelt infraction "made the seizure unreasonable even though they had probable cause to effect it." *Id*. Noting that "[t]he number of officers is not independently a 'seizure' of any kind," the court found that the officers had probable cause to stop the vehicle to investigate the seatbelt violation and that "[n]othing that occurred during the encounter … violated the Fourth Amendment." *Id*. (quotation marks and citation omitted).

The Court finds that the record clearly demonstrates that the officers had probable cause to initiate the traffic stop to investigate the parking violation and temporarily detain the vehicle's occupants. Because the stop was legal, and because McKenzie lacks standing to challenge the subsequent search of the vehicle, his motion to suppress evidence discovered during the search is DENIED.

        C.      **The Search of the Vehicle**

Even if McKenzie had standing to challenge the discovery of the weapon, he would be entitled to no relief. At the hearing, defense counsel argued that there was nothing about the parking violation that gave officers the right to search the vehicle. But the officers did not peer into the SUV simply because it was parked too far from the curb. Rather, they initially approached the SUV to investigate a parking violation because the car was illegally parked on the street. It was what transpired once they approached the SUV to address the parking violation that gave rise to probable cause for the officers to conduct the limited search of the lunge area.

The right to stop a vehicle to perform a "traffic stop may ripen into probable cause to search [the] vehicle based on the officer's interactions with the car's occupants." *United States v. Lyons*, 687 F.3d 754, 769–70 (6th Cir. 2012). "[U]nder the automobile exception to the warrant requirement, an officer may search a readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime." *United States v. Johnson*, 707 F.3d 655, 658 (6th Cir. 2013) (quotation marks and citation omitted). The search may extend to "any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U.S. 332, 347, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). The determination of the existence of probable cause is a "commonsense practical question" based on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230–31, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). "This totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective," taking into account law enforcement training and experience. *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (quotation marks and citation omitted).

McKenzie was found in the passenger seat of a vehicle parked illegally at night in a high crime area known for gang activity and violence. The individual seated in the driver's seat was an underaged female wearing minimal clothing that was not appropriate for the weather conditions. Sergeant Johnson testified that McKenzie immediately attempted to exit the vehicle upon the officers' approach, and that once back inside the vehicle, McKenzie acted erratically, moving about the interior of the vehicle, flailing his arms, and yelling at the officers. McKenzie ultimately ignored officers' orders to stay in the vehicle and exited the SUV, in an apparent attempt to leave the scene. Detective Harrigan confirmed McKenzie's bizarre behavior, including the fact that he would not make eye contact with the officers, and testified that he was

aware that McKenzie had prior criminal arrests and had previously resided with his mother in the house next door to where the vehicle was parked. The Court finds that under the totality of these circumstances, officers had probable cause to search the vehicle for evidence of criminal activity.[5] *See United States v. Dotson,* 49 F.3d 227, 231 (6th Cir. 1995) (defendant's effort to flee coupled with suspicion of money laundering activity constituted probable cause); *see also United States v. Smith*, 510 F.3d 641, 650 (6th Cir. 2007) (warrantless vehicle search permissible, though police had keys to car and suspects were secured, because of ready mobility of and reduced expectation of privacy in vehicle). These same facts would have also given the officers a right to conduct a limited search of the vehicle, in the immediate vicinity of McKenzie, for weapons because defendant's strange behavior and other attending facts observed at the scene would have led a reasonable officer to believe defendant was potentially dangerous. *See Mich. v. Long*, 463 U.S. 1032, 1050, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); *see, e.g., United States v. Griffin*, 589 F.3d 148, 153-54 (4th Cir. 2009) (officers had reasonable belief driver was dangerous because of informant's tip, high-crime neighborhood, and defendant's evasive behavior).

---

[5] From the evidence offered at the hearing, one might wonder whether the weapon was even discovered pursuant to a search. Detective Johnson testified that, while he was still standing outside the vehicle, he positioned himself between McKenzie and the vehicle, peered into the car and saw the gun in the lunge area. It is well settled that police may seize evidence that is in plain view without a warrant. *See United States v. Mathis*, 783 F.3d 719, 732 (6th Cir. 2013). Because the detective was properly in the vicinity of the parked vehicle when he observed the gun in the lunge area under the passenger seat in plain view, it could be concluded that probable cause was not even needed to recover it. *See, e.g., United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008) (officer properly confiscated weapon observed while "standing outside the vehicle" with the passenger door opened during traffic stop); *United States v. Anthony*, 47 F. App'x 731, 733 (6th Cir. 2002) (pistol observed through windshield when officer shined his flashlight inside car was properly seized under the plain view doctrine).

## III. CONCLUSION

For the foregoing reasons, McKenzie's motion to suppress is DENIED.

**IT IS SO ORDERED**.

Dated: February 23, 2021

                                                  **HONORABLE SARA LIOI**
                                                  **UNITED STATES DISTRICT JUDGE**